Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>   vs.<br><br>CASTLE & KING, a California corporation, formerly known as CASTLE & KING ROCK & READY MIX; KING EQUITIES LLC, a California limited liability company; DUSTIN ROBBEN and DOES 1-10, inclusive,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 and 1365, *et seq.*

## I.    INTRODUCTION

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants CASTLE & KING, KING EQUITIES LLC and DUSTIN ROBBEN ("Defendants") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.     On or about August 27, 2025, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to Defendants by certified mail, to Facility Manager, Castle & King, 105 Aegean Way, Vacaville, California ("Defendants' facility" or "the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.     A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.     More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.

5.     Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.     This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.     Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendants**

8.     Defendant CASTLE & KING, formerly known as Castle & King Rock & Ready Mix, located at 105 Aegean Way, in Vacaville, California, is a California corporation in good standing with the California Secretary of State.

9.     Defendant Castle & King is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

10.     Defendant DUSTIN ROBBEN is the Chief Executive Officer, Chief Financial Officer, Secretary and President of Castle & King and is also the legally responsible person for purposes of General Permit compliance at the Facility.

11.     Defendant KING EQUITIES LLC is the legal owner of the property on which the Facility operates.

### III.  **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

13.     Venue is proper because Defendants reside in and the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.  **ARTICLE III STANDING**

14.     Plaintiff is an environmental membership organization with active voluntary associational members who reside in northern California, as confirmed by documents on file with the California Secretary of State.

15.     Plaintiff has multiple identifiable associational members in northern California, as confirmed by public records.

16.     Plaintiff's status as a sole managing member limited liability company (as opposed to a non-profit corporation) is irrelevant to whether it has standing to bring this suit and is not dispositive of its ability to maintain its active associational members.

17.   Plaintiff's organizational purpose and mission is the protection, preservation and enhancement of the navigable rivers, lakes and oceans (and their tributaries) physically located in northern California.

18.   Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the CWA and California's Industrial General Permit, by seeking redress against industrial businesses located in northern California who violate the CWA and fail to comply with all standard conditions of California's Industrial General NPDES Permit ("General Permit").

19.   The filing of this complaint is germane to Plaintiff's organizational purpose and mission.

20.   Violations of the standard conditions of the General Permit are actionable by citizens under the CWA pursuant to 33 U.S.C. section 1365(f)(7).

21.   A subset of EDEN's current and identifiable associational members reside, work and/or recreate near the Ulatis Creek Watershed, a permanent, continuously flowing body of water which has an adjacent surface connection to the Sacramento River via Cache Slough.  The Sacramento River is a navigable Water of the United States which is part of the Sacramento-San Joaquin River Delta ("the affected waterways").  Some of EDEN's members use those waters and their watersheds for kayaking, canoeing, cycling, recreation, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of the affected waterways has been and continues to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

22.   A subset of EDEN's current and identifiable associational members described above are all persons for whom the aesthetic and recreational value of the affected waterways has been diminished and/or impaired on an ongoing and continuous basis as a direct result of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

23.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who are aware of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

24.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who believe that Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, have directly contributed to (a) degradation of the affected waterways downstream from the Facility; (b) injury to, deformation and toxicity of the aquatic life in the affected waterways; and (c) a reduction in the number of birds and other wildlife existing in the area.

25.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who intend to return to the affected waterways to recreate, albeit with a diminished desire and aesthetic enjoyment, directly attributable to Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein.

26.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to immerse any part of their body in the portion of the affected waterways downstream from Defendants' facility because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of water quality in the affected waterways since at least January 4, 2022, and continuing to the present, and concerns over potential adverse health effects caused by bodily contact with the affected waterways.

27.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who no longer wish to consume any fish caught from the affected waterways because of their awareness of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to degradation of the

River since at least January 4, 2022, and continuing to the present, and concerns over potential adverse health effects of consuming fish caught from the affected waterways.

28.    A subset of Plaintiff's current and identifiable associational members described in the paragraphs above are all persons who have experienced informational injuries directly resulting from Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the Facility, since at least January 4, 2022, and continuing to the present, as described herein.

29.    The informational injuries sustained by Plaintiff's current and identifiable associational members as described in the paragraphs above constitute a deprivation of the rights of the referenced persons to obtain complete and accurate information regarding Defendants' compliance with standard conditions of the General Permit at the Facility, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

30.    One of the most important standard conditions of the General Permit is monitoring and reporting, which is comprised of multiple separate requirements.

31.    The first step requires industrial businesses covered by the General Permit ("Permittees") identify in their Storm Water Pollution Prevention Plan ("SWPPP") all industrial materials and chemicals present at their facility.  For each industrial material/chemical identified, the Permittee is required to designate an indicator parameter as an additional sampling parameter if the material in question has any potential to commingle with storm water.  This ensures that Permittees are testing their storm water for all potential constituents likely to be present in their storm water runoff.

32.    The next step is to designate locations for collecting storm water samples which are representative of industrial activity.  This means that a Permittee must collect storm water samples from areas of their facility that are likely to show the presence of industrial materials and chemicals from outdoor industrial activities conducted by the Permittee.

33.     The General Permit requires Permittees to segregate their facility into separate drainage areas, defined by the direction of storm water flowing to a common area. Storm water encompasses both surface flow (above ground) and precipitation falling on the facility that enters drain inlets and flows through underground conveyances. Drainage areas are also dependent on the layout of facility in terms of the location of buildings, structures, ground elevations, grading and storm water conveyances.

34.     The Permittee is then required to designate at least one representative storm water sampling location for each of the segregated drainage areas.

35.     Defendants' facility handles numerous types of chemicals and industrial materials which are associated with the following toxic substances:  TPH-diesel.

36.     As described in this complaint and the attached Notice, to date Defendants has not yet conducted an adequate sampling parameter assessment for the Facility and has not segregated the Facility into separate drainage areas and depicted those drainage areas on the Facility's Site Map.

37.     Since January 4, 2022, and continuing to the present, Defendants has not collected storm water from all required areas of the Facility and has not tested the Facility's storm water for all required sampling parameters.

38.     In addition, Defendants' housekeeping practices at the Facility are extremely deficient on an ongoing and continuous basis and include allowing toxic chemicals and industrial materials to enter onsite storm drains which flow into the affected waterways; failing to clean up spills of toxic industrial materials; maintaining uncovered waste bins; significant excess outdoor storage of scrap and industrial materials, and significant staining on the ground from industrial materials and chemicals, as well as other deficiencies which are detailed in the attached Notice.

39.     Another standard condition of the General Permit is that all Permittees must upload to the SMARTS publicly accessible database system all storm water sampling analytical data, SWPPPs and Site Maps, Annual Reports and other required documents.

40.     The purpose of this requirement is to allow the general public to assist the regulatory agencies with monitoring Permittees' compliance with the standard conditions of the General Permit.

41.     The General Permit also requires Defendants' designated legally responsible person or duly authorized representative to certify under penalty of law that every document uploaded to SMARTS is true, correct and complete.

42.     Defendants' representatives have uploaded and certified documents to SMARTS which contain objectively false information, including Annual Reports which provide false explanations for Defendants' failure to collect storm water samples at the Facility; and false and deficient SWPPPs which include objectively false information related to drainage, storm water flow, drain inlets, mandatory sampling locations, industrial materials handled at the Facility, and storm water flow/sampling locations.

43.     As a result of Defendants' intentional misrepresentations as articulated above, Defendants has since January 4, 2022, and continuing to the present, avoided its mandatory responsibility pursuant to the CWA and General Permit of testing the facility's storm water for all industrial materials and chemicals handled at the facility which could potentially come into contact with storm water, in violation of the standard conditions of the General Permit.

44.     As a result of Defendants' intentional misrepresentations as articulated above, Defendants has since January 4, 2022, and continuing to the present, avoided its mandatory responsibility pursuant to the CWA and General Permit of collecting storm water from all required sampling locations present at the Facility, in violation of the standard conditions of the General Permit.

45.     Defendants' failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's associational members referred to in the paragraphs above from: (a) accessing on SMARTS the true operational facts relevant to Defendants' facility; and (b) acquiring accurate and complete data related to the unmonitored substances emanating from Defendants' facility during rain events.

46.     As such, Plaintiff's current and identifiable associational members referred to in the paragraphs above are unable to fully assess the extent of the General Permit violations at the facility, as well as the types and levels of industrial materials entering the affected waterways, due to Defendants' willful violations of the standard conditions of the General Permit at the Facility; or to gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

47.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above have been members of EDEN since at least the date of Plaintiff's Notice to Defendants.

48.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are individuals who have all experienced an ongoing, continuous, concrete, personal, specific, actual or imminent, non-speculative injury-in-fact commencing on and after January 4, 2022, and continuing to the present, arising directly from Defendants' failure to comply with the standard conditions of the General Permit at the Facility, as articulated herein.

49.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who would have standing to file this suit by themselves as individual plaintiffs.

50.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs  above are all persons who will not be required to personally participate in this lawsuit, except for the member(s) who have agreed to be identified for purposes of standing. Plaintiff will disclose the identities of those member(s) to Defendants in Plaintiff's Initial Disclosures, pursuant to the requirements of Federal Rule of Civil Procedure 26.

51.     The ongoing and continuous injuries sustained by the subset of EDEN's current and identifiable associational members described in the foregoing paragraphs will be adequately redressed by a judicial decision in this matter granting Plaintiff the injunctive relief requested herein.

52.     Defendants does not need to know the identity of any of Plaintiff's current and identifiable associational members described in the paragraphs above to understand and respond to this Complaint.

## V.  **STATUTORY BACKGROUND**

53.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

54.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Permittees or through the issuance of a single, statewide general permit applicable to all industrial storm water Permittees. 33 U.S.C. § 1342(p)

55.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

56.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of any standard condition of any NPDES Permit.

57.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

58.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

59.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation, for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

60.     Violations of the standard provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A.  **General Permit**

61.     The California Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

62.     The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

63.     The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

64.     A complete copy of the current General Permit Order is accessible at
https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

65.     All industrial facilities located in California having the potential to discharge
storm water associated with industrial activity which have not obtained an individual NPDES
permit must apply for coverage under the General Permit by filing Permit Registration
Documents, including a Permit Application, and an initial SWPPP and Site Map.

66.     The specific industrial facilities required to apply for General Permit coverage are
identified on Attachment A to the General Permit.

### 1.     SMARTS Compliance Database

67.     The Water Board has established an online database referred to as its Stormwater
Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where
Permittees enter and manage storm water data associated with General Permit compliance.

68.     SMARTS is readily accessible by the general public on the web; and the system is
maintained primarily for the purpose of providing public access to allow citizens to monitor
Permittees' compliance with the General Permit and to pursue Permittees who fail to comply,
utilizing the citizen's suit provision of the CWA.

69.     SMARTS can be accessed at California Stormwater Multiple Applications and
Report Tracking System.

70.     The General Permit requires Permittees to certify (under penalty of law) and
submit to SMARTS all Permit Registration Documents, including Permit Applications, SWPPPs
and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual
Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L),
Attachment D.

### 2.     Standard Conditions of the General Permit

71.     The General Permit contains a variety of substantive and procedural standard
conditions.

72.    The General Permit requires that Permittees comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

73.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices* ("BMPs");

(c)    Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)    Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all required sampling locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)    Establishing an onsite compliance Team of at least two employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

74.    All Permittees are required to develop and implement a SWPPP.

75.    The main objective of the SWPPP requirement is to identify and evaluate sources of industrial materials and chemicals associated with industrial activities that may affect the quality of storm water runoff from the Permittee's facility, and to implement best management practices ("BMPs") to reduce or prevent materials associated with industrial activities in storm water runoff emanating from the Permittee's facility.  General Permit § X(C).

76.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

77.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

78.    Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of an onsite compliance Team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a discussion of whether industrial materials or chemicals have the potential to commingle with storm water;  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent industrial materials in storm water runoff. General Permit §§ X(A)-X(I)

79.    The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

80.    Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water from the facility, locations of storm water collection and conveyance systems, associated sampling locations,

locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas. General Permit § X(E)

### Best Management Practices

81.    The General Permit requires all Permittees to implement and maintain the following minimum Best Management Practices: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping.   General Permit § X(H)(1)

82.    The General Permit further requires Permittees to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs if necessary: exposure minimization BMPs, storm water containment BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

83.    Failure to implement minimum and advanced BMPs as necessary is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

### Monitoring and Reporting/Storm Water Sampling and Analysis

84.    The General Permit requires Permittees to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of industrial materials in a facility's storm water runoff to ensure compliance with the General Permit.

85.    As part of their monitoring program, Permittees must identify all required storm water sampling locations and evaluate the effectiveness of BMP .

86.    Section XI(B) of the General Permit requires that Permittees collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting

year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

87.    A QSE is a precipitation event that produces measurable precipitation for at least one drainage area and is preceded by 48 hours with no measurable precipitation in any drainage area.  General Permit §XI(B)(2)

88.    Once the storm water samples have been collected, the General Permit requires that Permittee's must deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

89.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Permittee on a facility-specific basis.  General Permit § XI(B)(6)(c)

90.    Facilities are also required to conduct monthly and sampling event visual observations.  Monthly visual observations must be conducted during daylight hours on days without precipitation and must include observing each drainage area; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and monitoring BMPs for effectiveness.  Sampling event visual observations are conducted at the same time as sampling occurs and must include observing storm water runoff for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris.  General Permit § XI(A)

Annual Comprehensive Facility Evaluation

91.    The General Permit requires Permittees to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

92.    Section XVI(A) of the General Permit requires all Permittees to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

93.    Annual Reports are auto populated by SMARTS from Permittees' answers to a series of twelve questions, which require mostly yes/no responses.

94.    The questions include whether the Permittee has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all required sampling locations at its facility; and where the facility is located within an impaired watershed, the Permittee has assessed whether any of the receiving water impairments are present at their facility.

95.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

Certification of Compliance Documents

96.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## VI. SPECIFIC FACTUAL ALLEGATIONS

### A. The Facility

97.     Castle & King, located at 105 Aegean Way in Vacaville, California, is a facility that manufactures ready-mixed concrete and sells wholesale aggregates to the public for landscaping purposes.

98.     Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 3273-Ready Mix Concrete, based on public records.

99.     SIC Code 3273 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

100.    Based on the foregoing, Plaintiff alleges that Defendants are required to maintain standard General Permit coverage and are not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

### C. Defendants' General Permit Violations

Deficient SWPPP/Failure to Follow SWPPP

101.    Since at least January 4, 2022, Defendants have failed to implement an adequate SWPPP for the Facility and have failed to comply with the terms of the Facility's deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

102.    Defendants' continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Castle & King, as well as by required documents which have not been uploaded to SMARTS.

103.    Defendants' continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

104.    As is more particularly described in **Exhibit A**, attached hereto and incorporated herein by reference, Plaintiff's Notice issued to Defendants on August 27, 2025, delineated numerous deficiencies in various versions of Defendants' SWPPPs and Site Maps.

105.    The 60-day notice period on Plaintiff's Notice expired on October 27, 2025, without correction of the violations alleged in Plaintiff's Notice.

106.    Defendants' current SWPPP and Site Map remains deficient for failure to include the following:  (a) complete and accurate Industrial Material Inventory List and discussion of onsite industrial materials/chemicals likely to commingle with storm water [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of Facility drainage and all mandatory sampling locations [violation of General Permit §§  X(I) and X(G)(1)(e)].

107.    Defendants' current SWPPP and Site Map does not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

108.    Defendants' current SWPPP has not been revised as required by the General Permit to reflect true conditions at the Facility.

109.    Defendants' current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the Facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

110.    Defendants have failed and continue to fail to alter the Facility's SWPPP/Site Map to comply with the requirements of the General Permit.

111.    In addition, Defendants have failed to comply with the provisions of the Facility's current SWPPP in the areas of monitoring and reporting.

112.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendants' deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

113.    Plaintiff alleges that Defendants' monitoring and reporting program at Castle & King is deficient and in violation of the mandatory standard conditions of the General Permit. General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

114.    Defendants' deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

115.    Defendants' deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and government agencies, as well as other relevant documents maintained by Defendants and governmental and regulatory agencies.

116.    Since January 4, 2022, Defendants have failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

117.    In addition, Defendants have failed to conduct monthly visual observations at the Facility since at least January 4, 2022.

118.    Defendants have also collected samples of storm water at the Facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without precipitation, as is more particularly described in Plaintiff's Notice attached hereto as **Exhibit A**.

119.    Defendants have failed to collect storm water samples from each drainage area at all mandatory sampling locations at its Facility, for each QSE where sampling is performed,

pursuant to General Permit § XI(B), as is more particularly described in the Notice attached hereto as **Exhibit A**.

120.    Defendants have failed to deliver storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

121.    Defendants have failed to upload storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

122.    Defendants have failed to properly analyze its collected storm water samples for the parameter of pH, in violation of Section XI(C)(2)(a) of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A**.

<u>Falsification of documents certified and submitted to SMARTS</u>

123.    Since January 4, 2022, Defendants have submitted inaccurate and falsified documents to the Water Board and general public via SMARTS, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

124.    Defendants' submission of false documents via the SMARTS system and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants.

125.    Defendants' submission of false documents is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

126.    Defendants' submission of documents including false statements to the Water Board and the general public is ongoing and continuous.

Failure to Implement Adequate Best Management Practices

127.    Since at least January 4, 2022, Defendants have failed to identify and implement adequate Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit.

128.    Defendants' failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

129.    Defendants' BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

130.    Defendants' BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

131.    Defendants' BMP deficiencies are more particularly described in the Notice attached hereto as **Exhibit A** and incorporated herein by reference.

Failure to Train Employees

132.    Since at least January 4, 2022, Defendants have failed to implement and train an onsite compliance Team at the Facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

133.    The General Permit requires all Permittees to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing an onsite compliance Team and ensuring that the Team is properly

trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

134. Defendants' failure to implement and train a compliance Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

135. Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

136. Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is also evidenced by Defendants' ongoing and continuing General Permit violations.

137. Other evidence of Defendants' failure to implement and train an onsite compliance Team includes the fact that previously designated Team Members have left the Facility.

138. Defendants' failure to implement and train an onsite compliance Team in violation of the General Permit is ongoing and continuous.

## FIRST CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update an Adequate Storm Water Pollution Prevention Plan
#### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

139. Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

140. The General Permit requires Permittees to develop and implement on an ongoing basis an adequate SWPPP, including a detailed and accurate Site Map.

141.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

142.    Each day since January 4, 2022, that Defendants have failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

143.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

144.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

145.    The General Permit requires Permittees to develop and implement on an ongoing basis a monitoring and reporting program that complies with the terms of the General Permit.

146.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for the Castle & King facility.

147.    Each day since at least January 4, 2022, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

148.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of False Documents to the Regional Water Board/SMARTS**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

149.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

150.    Section XVI of the General Permit requires that all documents submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendants made false representations in the Facility's Annual Reports, SWPPPs and other documents, and have failed to correct or retract the false statements.

151.    Each time since January 4, 2022, that Defendants have made false or misleading statements in documents submitted to the Water Board via SMARTS under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

152.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' failure to withdraw any of the false and/or incomplete statements submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement Appropriate BMPs**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

153.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

154.    As alleged herein, Defendants have failed to properly implement the required Best Management Practices ("BMPs") at the Facility.

155.    Each day since at least January 4, 2022, that Defendants have failed to implement the required minimum BMPs in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

156.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate BMPs at the Facility.

### FIFTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

157.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

158.    Section X(D)(1) of the General Permit requires each facility to establish an onsite compliance Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate Team members to implement the SWPPP and conduct required monitoring when the regularly assigned Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

159.    Section X(H)(f) of the General Permit also requires that Permittees ensure that all Team members implementing the various compliance activities of the General Permit are properly trained.

160.    Since at least January 4, 2022, Defendants have failed to properly implement and train an onsite compliance Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the Castle & King facility in compliance with all standard conditions of the General Permit;

3.      Order Defendants to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

4.      Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

5.      Award such other and further relief as may be just and proper.

Dated:  October 27, 2025                    Respectfully,


By:  ___/S/_Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff

# EXHIBIT A



# EDEN

*Central Valley* **Eden Environmental Defenders**

August 27, 2025

<u>Via US Mail, Certified and Email</u>

Dustin Robben                Email:  dustin@rockonck.com
Castle & King
105 Aegean Way
Vacaville, CA 95687

<u>Via US Mail</u>

Benjamin Button              Email:  ben@rockonck.com
Agent for Castle & King Rock & Ready Mix
105 Aegean Way
Vacaville, CA  95687

Richard Martin
King Equities LLC
105 Aegeam Way
Vacaville, CA  95687


**Re:    FOURTH AMENDED 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Castle & King Rock & Ready Mix Inc, Castle & King Inc and King Equities LLC, including Benjamin Button, Dustin Robben and Richard Martin:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to amend the lawsuit filed in US District Court, Eastern District of California, entitled *Central Valley Eden Environmental Defenders v. Castle & King Rock & Ready Mix* (Case No 2:23-cv-02616-SCR) to add **Castle & King Inc (California corporate entity No. B20250042266), the Facility property owner King Equities LLC, Dustin Robben, Benjamin Button and Richard Martin as additional defendants.**

---

1520 E. Covell Blvd #B5                Telephone:  (800) 545-7215
Davis, CA  95616                       Email:  admin@edendefenders.org

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Castle & King Rock & Ready Mix, Castle & King and King Equities and their principals ("Defendants", "Castle & King" or "Dischargers"), as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Castle & King to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Dischargers of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Castle & King under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2020-XXXX-DWQ) (hereinafter "General Permit").

### Castle & King Rock & Ready Mix Inc

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around January 4, 2022, Castle & King Rock & Ready Mix (California corporate entity No. C0739043) submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit and was assigned Waste Discharger Identification number ("WDID") 5S48I029578.

According to the NOI and Facility SWPPP, Castle & King Rock & Ready Mix has been continuously operated by its facility manager Dustin Robben since at least January 4, 2022.

On July 1, 2025, Castle & King Rock & Ready Mix submitted to the Water Board a Notice of Termination request based on (a) a separate NPDES Permit that it alleged was approved effective May 15, 2025; and (b) the claim that there was a new operator (Castle & King, Inc.).

Records on file with the California State Water Resources Control Board indicate that the Notice of Termination was approved on July 10, 2025, effectively terminating General Permit coverage for the facility, WDID 5S48I029578.

Records on file with the California Secretary of State confirm that Castle & King Rock & Ready Mix (California corporate entity No. C0739043) remains an active corporation as of the date of this letter.

### Castle & King Inc

Records on file with the California Secretary of State confirm that on March 24, 2025, Dustin Robben submitted Articles of Incorporation to the Secretary of State for formation of a new corporation, Castle & King, Entity No. B20250042266, with an operating addresss of 105 Aegean Way in Vacaville, CA.

On August 14, 2025, Castle & King applied for and received coverage under the General Permit and was assigned Waste Discharger Identification number ("WDID") 5S48I031221.

### King Equities LLC

The property on which the Castle & King concrete batch plant facility, at 105 Aegean Way, Vacaville, CA is and has been wholly owned since May 14, 2029, by King Equities LLC.

Records on file with the California Secretary of State indicate that since March 16, 2021, King Equities LLC has been consistently owned and managed by Benjamin Button and Richard Martin.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Castle & King Rock & Ready Mix Inc, Castle & King Inc, King Equities LLC, Benjamin Button, Dustin Robben and Richard Martin ("collectively hereinafter "Castle & King" or "the facility") have committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.    THE LOCATION OF THE ALLEGED VIOLATIONS

### A.    <u>The Facility</u>

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Castle & King's permanent facility address of 105 Aegean Way in Vacaville, California.

Castle & King is a facility that manufactures ready-mixed concrete and aggregate and runs a local trucking company.  Facility operations are covered under Standard Industrial Classification Code (SIC) 3273 - Ready Mix Concrete.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3273, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as Iron.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.    <u>The Affected Receiving Waters</u>

The Facility discharges directly into the City of Vacaville's MS4 system and Ulatis Creek, which abuts the facility.  Stormwater discharges from the Facility reach the Sacramento-San Joaquin River Delta via the Sacramento River, by way of Ulatis Creek and Cache Slough. ("Receiving Waters").  The Facility's Receiving Waters are impaired for Carcinogenic Pesticide

Screen, Chlorpyrifos, Diazinon, Mercury, Electrical Conductivity, DDT (Dichlorodiphenyltrichloroethane).

The Sacramento River/Sacramento-San Joaquin River Delta is a water of the United States. The CWA requires that water bodies such as the Sacramento-San Joaquin River Delta meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### VIOLATIONS ALLEGED AGAINST ALL PARTIES:  (Castle & King Rock & Ready Mix, Dustin Robben, Benjamin Button, Richard Martin, Castle & King, Inc and King Equities, LLC)

#### A.    *Deficient SWPPP and Site Map*

Between January 4, 2022, and July 10, 2025, Castle & King Rock & Ready Mix failed to develop, implement and certify and submit to SMARTS a Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility that complies with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

Between August 14, 2022, and the present, Castle & King failed to develop, implement and certify and submit to SMARTS a SWPPP and Site Map for the Facility that complies with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

Specifically, Castle & King Rock & Ready Mix' SWPPPs certified and submitted to SMARTS on January 3, 2022, and February 8, 2024; and Castle & King's current SWPPP certified and submitted to SMARTS on August 7, 2025, are deficient as follows:

1.    The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

(a)  Depiction of the storm water drainage areas within the facility boundary. Specifically, the site map fails to depict the boundaries of the two drainage areas at the facility.  Drainage Area 1 encompasses the entire eastern portion of the facility property, east of the shop; while Drainage Area 2 encompasses the entire western portion of the facility property, west of the shop.

(b)  Accurate storm water flow direction of each drainage area.  The site map depicts inaccurate stormwater flow direction;

(c)  Sampling points which are representative of facility operations and which are within the boundaries of the facility.  Specifically, there is a drain inlet located within the northeastern portion of the facility which is a mandatory sampling location in Drainage Area 1.  Stormwater must be sampled prior to the location that it leaves the boundaries of the facility property.  Instead of designating this area as a sampling location, Castle & King have intentionally designated a City manhole located in the middle of Aegean Street as the sampling location, in violation of the General Permit.

The drain inlet in fact was originally designated as sampling location "Yard".  After stormwater collected from the Yard inlet was found to contain extremely high levels of oil & grease and iron, the facility suddenly ceased sampling from the Yard.

The other sampling location should at grab sample at a low spot near at the base of Drainage Area 2 near the fence line, prior to where stormwater enters the driveway and parking lot. This area is industrial, not non-industrial as falsely and fraudulently labeled on the Site Map.

(d)  Locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction (i.e. storm drain inlets and underground conveyances).  Specifically, the underground connection depicted between the Yard drain inlet and the street sewer system is inaccurate and fraudulent.

(e)  Locations and descriptions of all structural control measures that affect industrial

storm water discharges, authorized NSWDs and/or run-on;

(f) Locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred; and

(g) All areas of industrial activity subject to the General Permit.

2.    The SWPPP does not include all the required elements, as indicated below:

(a) A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(b) A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(c) An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(d) A complete and accurate pollutant source assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the facility likely to come into contact with stormwater (Section XI.B.6); and

(e) An accurate and complete discussion of **drainage areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section XI).

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B. Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

#### 1. Failure to Conduct Visual Observations and Maintain Compliant Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Monthly visual observations must be conducted during daylight hours and during scheduled facility operating hours, on days without any precipitation.

Monthly visual observations must include a visual observation of each drainage at the Facility, for the following: (a) the presence or indications of prior, current, or potential unauthorized NSWDs and their sources; (b) authorized NSWDs, sources, and associated BMPs to ensure compliance with Section IV.B.3; and (c) all outdoor industrial equipment and storage areas, all outdoor industrial activities areas, BMPs, and all other potential source of industrial pollutants.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations. The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN alleges that between January 4, 2022, and the present Castle & King has failed to conduct visual observations every month pursuant to Section XI.A of the General Permit and to

maintain adequate contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

EDEN also alleges that between January 4, 2022, and the present, Castle & King has failed to conduct monthly visual observations of each drainage area at the facility and to observe each drainage area for the following:

The presence or indications of prior, current, or potential unauthorized NSWDs and their sources; authorized NSWDs, sources, and associated BMPs to ensure compliance with Section IV.B.3; and outdoor industrial equipment and storage areas, outdoor industrial activities areas, BMPs, and all other potential source of industrial pollutants.

EDEN also alleges that between January 4, 2022, and the present, Castle & King has failed to conduct monthly visual observations during daylight hours, during scheduled facility operating hours and on days without precipitation.

2.  Failure to Collect and Analyze the Required Number of Storm Water Samples

EDEN alleges that between January 4, 2022, and the present, Castle & King has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Castle & King has failed to upload into the SMARTS database system *any* storm water run-off sample analyses for the reporting year 2021-22; has failed to collect and analyze the required number of stormwater samples for the 2022-23, 2023-24 and 2024-25 reporting years; and has not provided an adequate and accurate explanation for its failure to do so.

3.  Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   (Attachment C to General Permit-Glossary)

Castle & King's stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date | QSE Info |
|---|---|
| 2/24/2023 | Not a valid QSE – Second consecutive day of rainfall |
| 3/29/2024 | Not a valid QSE – Second consecutive day of rainfall |
| 4/1/2025 | Not a valid QSE – Third consecutive day of rainfall |

4.  <u>Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection</u>

Pursuant to Attachment H, Section 2 of the General Permit, Dischargers are to deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  Castle & King's storm water runoff samples listed below were not delivered to the Facility's Laboratory in that time frame:

| Sample Date | Date Laboratory Received Sample |
|---|---|
| 12/9/2022 | 12/16/2022 |
| 2/29/2024 | 3/6/2024 |
| 3/29/2024 | 4/3/2024 |
| 4/1/2025 | 4/5/2025 |

5.  <u>Failure to Sample Correctly for the Parameter of pH</u>

Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes.  Castle & King's laboratory report(s) for sample(s) collected on the following dates evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time.

| |
|---|
| 12/9/2022 |
| 2/24/2023 |
| 4/1/2025 |

6.  Failure to Utilize the Correct Sampling Parameter Units in Analytical Report

Table 2, Section XI.B.11 of the General Permit requires that all storm water analytical reports indicate parameters levels in units of milligrams per liter ("mg/L").

Castle & King's storm water analytical reports for stormwater samples collected on December 9, 2022; and February 24, 2023, reported the Facility's parameter levels for Iron in units of micrograms per liter ("ug/L"), instead of milligrams per liter ("mg/L").

7.  Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

Castle & King failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Lab Report Receipt Date | Date Uploaded into SMARTS |
|---|---|---|
| 12/9/2022 | 12/29/2022 | 7/12/2023 |
| 2/24/2023 | 3/3/2023 | 7/12/2023 |

8.  Failure to Collect Samples From Each Drainage Area at all Discharge Locations

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations, regardless of whether the discharges are substantially similar.  Dischargers may analyze a combined sample consisting of equal volumes, collected from as many as four substantially similar industrial discharge locations, provided that the Discharger submits a Representative Sampling Reduction Justification form with its sample analysis, and the samples are combined in the lab in accordance with Section XI.C.5 of the General Permit.  Furthermore, Representative sampling is only allowed for sheet flow discharges or discharges from drainage areas with multiple discharge locations.

EDEN's investigation, as detailed above, confirms that there are two drainage areas at the facility and at least two mandatory sampling locations, both of them industrial and subject to mandatory sampling.

Castle & King's SWPPPs and Site Maps certified and submitted to SMARTS on January 3, 2022; February 8, 2025; and  August 7, 2025; confirm the Facility has two discharge locations, specified as DP-1 and DP-2.   The storm water runoff sample analyses Castle & King uploaded for samples collected on the dates listed below failed to include samples from Outfall DP-2.

| 12/9/2022 |
|-----------|
| 2/24/2023 |
| 2/29/2024 |
| 3/29/2024 |
| 4/1/2025  |

### C. *False Documents Submitted to the Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Castle & King has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by certifying and submitting to SMARTS false Annual Reports for the reporting years 2021-22, 2022-23, 2023-24 and 2024-25.

Castle & King has also submitted false statements in its SWPPPs and Site Maps certified and submitted to SMARTS on January 3, 2022; February 8, 2024; and August 7, 2025, with respect to stormwater drainage, flow, discharge locations, underground conveyances and industrial areas and outdoor industrial activities.

In addition, Castle & King certified and submitted to SMARTS on July 1, 2025, a Notice of Termination which includes false and misleading information.

Pursuant to Section XXI.N of the General Permit:

*Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of*

*compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.*

The Annual Reports submitted included Attachment 1 in response to Question 3 (whether the facility collected and analyzed the required number of stormwater samples) as an explanation for why Castle & King failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the reporting years for all discharge locations, in accordance with Section XI.B.

Benjamin Button certified in the Annual Reports submitted for the 2021-22, 2022-23 and 2023-24 reporting years that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges occurring business operating hours during the reporting years.

However, EDEN's investigation confirms that this claim is objectively false. Furthermore, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Castle & King to have collected the requisite number of samples.

Furthermore, Castle & King submitted its 2021-22 Annual Report late on October 5, 2022; and its 2022-23 Annual Report on July 12, 2022--a year before its due date. Thus, all certifications made by Mr. Button in the 2022-23 Annual Report are in fact false and in objective violation of Sections XVI.A, XXI.L and XXI.N of the General Permit.

Castle & King's 2024-25 Annual Report certified and submitted to SMARTS by Benjamin Button on June 23, 2025, contains an objectively false statement in response to Question 3 which indicates that the required number of stormwater samples were collected during the year. However, only one stormwater sample was in fact collected during the entire 2024-25 reporting year (on April 1, 2025), resulting in a false and fraudulent Annual Report.

The false statements in the Notice of Termination certified as true and correct under penalty of law by Benjamin Button include the following:

1. That the facility is regulated by another general or individual NPDES permit, effective May 15, 2025. As of the date of this notice, Dustin Robben of Castle & King, Inc. has failed to apply for any general or individual NPDES permit; and the concrete batch plant facility located at 105 Aegean Way in Vacaville, CA is currently operating without permit coverage, in violation of federal and state laws.

2. That the Facility was transferred to a new operator. While California Secretary of State documents indicate that a new entity Castle & King, Inc. was formed by Dustin Robben, with an operating address of 105 Aegean Way in Vacaville, California, EDEN alleges that (a) there has not been an actual change in operation of the facility; and (b) the Notice of Termination submitted to the Water Board is nothing more than a ruse to avoid liability for the lawsuit filed by EDEN against this Discharger.

EDEN's allegations are based on the following verified facts:

1. Castle & King Rock & Ready Mix Inc was originally formed in 1975 by David Castle and Charles King, and has operated from 105 Aegean Way in Vacaville, CA continuously since that date;

2. On May 14, 2019, the physical property on which the facility operates was transferred from entities controlled by Mr. Castle and Mr. King to King Equities, LLC. The principals of King Equities are Richard Martin and Benjamin Button;

3. On June 11, 2019, Castle & King Rock & Ready Mix filed amended Articles of Incorporation naming Benjamin Button as its President and Secretary. Additional documents on file with the Secretary of State indicate that Mr. Button is also the CEO of Castle & King Rock & Ready Mix Inc;

4. On January 4, 2022, Castle & King Rock & Ready Mix Inc applied for General Permit coverage for its facility located at 105 Aegean Way in Vacaville, CA, after illegally operating for three years without General Permit coverage. The application for General Permit coverage indicates that the Facility Operator is "Dustin Robben" of Castle & King Rock & Ready Mix Inc;

5. On January 3, 2022, and again on February 8, 2024; Benjamin Button certified and submitted SWPPPs which indicate that the Facility Operator of Castle & King Rock & Ready Mix is "Dustin Robben, 105 Aegean Way, Vacaville, CA";

6. On November 13, 2023, EDEN filed this lawsuit.

7. On March 24, 2025, Dustin Robben formed a new corporation named Castle & King, Inc., with a business operating address of 105 Aegean Way in Vacaville, CA;

8. On May 15, 2025, the Court issued an Order denying the Motion to Dismiss filed by Defendant Castle & King Rock & Ready Mix;

9. On July 1, 2025, Castle & King Rock & Ready Mix certified and submitted to the Water Board its Notice of Termination claiming that the facility had been transferred to a new owner/operator;

10. Dustin Robben, the principal of Castle & King, has to date intentionally failed to apply for General Permit coverage for the Facility;

11. Castle & King Rock & Ready Mix remains an active corporation, with a principal operating address of 105 Aegean Way, Vacaville, CA; and

12. King Equities, LLC (including Benjamin Button) continues to own the physical property on which the facility operates.

## D. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Castle & King has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Castle & King's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

Specific BMP deficiencies confirmed by EDEN, the Facility's environmental consultants and representatives of the Water Board May 8, 2023, October 6, 2023 and April 25, 2024, include the following:

1. Material tracking from the Facility to the street;
2. Drain Inlet located near raw materials without inlet filtration or protection;
3. Numerous spills of oil & grease present on the ground surfaces;
4. Concrete fines and dust on the ground surfaces near outdoor operations;
5. Deficient spill and cleanup BMPs relating to fuel and oil;

6. Deficient containment practices for fuel and oil storage;
7. Insufficient employee training;
8. Insufficient sweeping practices.

### E. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### 1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit. The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Castle & King's exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit. EDEN alleges and notifies Castle

& King that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Castle & King's ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Castle & King's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

## 2. Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the San Francisco Bay and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•    All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below. These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Castle & King on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations. The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess

its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least December 9, 2022, to the present, Castle & King has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, Castle & King's sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for the Sacramento River.

Further, Castle & King has failed to comply with Section XX.B of the General Permit. Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2022-23** | | | |
| 12/9/2022 | DP-1 Yard | Iron | 16 |
| | | Oil & Grease | 114 |
| | | TSS | 134 |
| | | pH | 8.51 |
| | | | |
| 2/24/2023 | DP-1 Drain | Iron | 1.9 |
| | | | |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on *Table 2 of the General Permit,* as well as the Maximum Contaminant Levels (MCLs) listed in the *California Code of Regulations, Title 22, Section 64431* (Table 64431-A) and the Water Quality Control Plan *(Basin Plan)* for the *California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition* (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### F.  Failure to Comply with Exceedance Response Action Requirements

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

Level 1 ERA Evaluation and Report

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous Numeric Action Level ("NAL") exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process. The ERA process requires the Discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), and to do so by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit. Furthermore, the Evaluation must include all drainage areas at the facility.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report. (Section XII.C.2). The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1. The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed. The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address).

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

**Deficient Level 1 ERA Report**

Based on the test results summarized above, Castle & King was elevated to Level 1 Status for Iron and Oil & Grease on July 1, 2023, pursuant to Section XII.C – Exceedance Response Actions of the General Permit.

Castle & King certified and submitted to SMARTS a Level 1 ERA Report on December 29, 2023.  However, the Level 1 ERA Report does not comport with the requirements of Section XII.C of the General Permit.

The Level 1 ERA Report fails to include an adequate evaluation of all drainage areas af the facility. Specifically, the Report falsely indicates that Drainage Area 2, discharge location DP#2 is not exposed to industrial activity.

In fact, operations in Drainage Area 2 include outdoor storage of raw materials, loading and unloading, truck traffic, and operation of industrial equipment such as forklifts and hand trucks.

The parking lot located on the southernmost portion of the facility receives stormwater from the industrial operations occurring in the northwestern portion of Drainage Area 2, due to lack of berms or other stormwater diversion measures.  Thus, Drainage Area 2 cannot be characterized as non-industrial.

The Facility Level 1 ERA Report does not provide a detailed description of necessary SWPPP revisions, including the specific citation and location of the revisions to the SWPPP, or identify BMPs that will *prevent* the NAL exceedances and achieve compliance with the General Permit.

The Level 1 ERA Report is further inadequate because it did not confirm that all additional BMPs necessary to achieve a reduction of the Facility's parameter exceedances have in fact been implemented.

Based on the foregoing, Castle & King has failed and continues to fail to submit a Level 1 ERA Report that complies with the General Permit and is in in daily violation of the General Permit.

### G.  *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP

implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Castle & King has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Castle & King may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Castle & King Rock & Ready Mix Inc, Castle & King Inc and King Equities LLC, including Benjamin Button, Dustin Robben and Richard Martin.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is January 4, 2022, to the date of this Notice. EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice. Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorneys representing the entity giving this 60-day Notice are:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616

Email: adam@edendefenders.org
Telephone: (800) 545-7215

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of <u>$57,617.00 per day, for each violation occurring on or after November 2, 2015</u>.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Lee M. Zeldin, Director, U.S. Environmental Protection Agency, zeldin.lee@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov
Javier Orozco, State Water Resources Control Board, Javier.orozco@waterboards.ca.gov